1
2
3
4
5
6
7

8                      UNITED STATES DISTRICT COURT

9                      EASTERN DISTRICT OF CALIFORNIA

10

11  | SACRAMENTO CITY UNIFIED | No.  2:14-cv-01549-TLN-DB |
    | SCHOOL DISTRICT, | |
12  | | |
    | Plaintiff, | |
13  | | **OPINION** |
    | v. | |
14  | | |
    | R.H., by and through her Guardians ad | |
15  | Litem, J.H. and K.H., and J.H., and K.H., | |
    | individually | |
16  | | |
    | Defendants. | |
17

18
          This matter is before the Court on Plaintiff Sacramento City Unified School District's

19
    ("Sacramento") motion for summary judgment.  (ECF No. 18)  Defendants R.H. ("Student"), by

20
    and through her Guardians ad Litem, J.H. ("J.H." or "Mother") and K.H. ("K.H." or "Father")

21
    (collectively, "Parents"), as well J.H. and K.H. individually, (together, "Defendants")

22
    responded with an opening brief, which the Court interprets as a cross-motion for summary

23
    judgment.[1]  (ECF No. 19.)  The Court has carefully considered all briefings filed in this case.  For

24
    the reasons set forth below, the Court hereby DENIES Sacramento's motion for summary

25
    judgment and finds that the Administrative Law Judge's ("ALJ") decision is substantially

26
    ---
    [1]        In the action before the administrative law judge, Sacramento City Unified School district was the
27  designated defendant while R.H., J.H., and K.H. were the plaintiffs.  In the instant action, this Court has designated
    Sacramento City Unified School districted as plaintiff since the matter is before this Court on their motion for
28  summary judgment.  Thus, R.H., J.H., and K.H. will be designated as defendant.

                                        1

1   supported by the administrative record and thus AFFIRMS the ALJ's decision.  The Court further

2   DENIES Defendants' motion for summary judgment as to Defendants' second and third

3   counterclaim.

4          **I.**       **PROCEDURAL BACKGROUND**

5          This case arises from a dispute regarding the provision of educational services to Student,

6   a child with special educational needs.  Parents filed a complaint with the California Office of

7   Administrative Hearings against Sacramento on Student's behalf, as well as individually, for

8   alleged violations of the Individuals with Disabilities Education Act, 20 U.S.C. § 1401, et seq.

9   ("IDEA") in connection with Sacramento's provision of educational services.  (Compl. ECF No.

10  1 at ¶ 41.)  A decision was rendered by an Administrative Law Judge ("ALJ") on May 23, 2014.

11  (ECF No. 1 at ¶ 42.)  The decision found in favor of Sacramento on some issues, but also

12  determined that Sacramento did not offer appropriate mental health therapy services or

13  appropriate academic instruction for Student and ordered Sacramento to reimburse Parents for a

14  year of Student's attendance at a residential treatment facility.  (ECF No. 1 at ¶ 44.)  Sacramento

15  appeals the ALJ's decision, alleging that the ALJ's findings are erroneous, contrary to law, based

16  upon misinterpretation or misapplication of controlling law, and was unsupported by the evidence

17  presented at the hearing.  (ECF No. 1 at ¶ 45.)

18         **II.**       **FACTUAL BACKGROUND**[2]

19         A.  General Education Background

20         At the time of the ALJ's decision, Student was a 17 year old girl in the eleventh grade.

21  Her father resided within the educational boundaries of Sacramento and her mother resided

22  elsewhere in the area.[3]  From kindergarten through eighth grade, Student attended elementary

23  schools in Sacramento.  Beginning in ninth grade, Student transferred into the San Juan Unified

24  School District ("San Juan").

---

[2]    The following information pertaining to the factual background of this case was taken from the ALJ's Decision dated May 23, 2014, and labeled Administrative Record 2013100405 ("AR") at 1085−1108.  The Court has independently reviewed the evidence referenced herein, but relies on the Administrative Record for the purposes of continuity.

[3]    Student's Parents were divorced when she was six years old. They have joint legal custody of her, and have alternated having physical custody of her during the relevant time period.

At an Individualized Education Program ("IEP") team meeting on May 1, 2013, when Student was in tenth grade, San Juan determined that she was eligible for special education and related services under the educational category of emotional disturbance.  Two weeks later, her parents reenrolled Student in Sacramento and requested special education services.  Sacramento held two IEP team meetings that are the subject of this case: the first on June 5, 2013, and the second on September 27, 2013.  At both IEP team meetings, Parents requested that Student be placed in a residential treatment facility, but Sacramento denied the requests.  In October 2013, Parents unilaterally placed Student in a residential treatment center called Falcon Ridge Ranch ("Falcon Ridge") in Utah, where she still was at the time of hearing.

B.  Ninth and Tenth Grade Years (2011−2012 and 2012−2013 School Years)

In early 2012, Student began outpatient treatment for depression at Kaiser Permanente Medical Group ("Kaiser").  On May 30, 2012, at the end of ninth grade, Student was hospitalized at Sierra Vista Hospital, an inpatient psychiatric facility, after an attempted suicide by overdosing on a combination of prescription and over-the-counter medications at home.  Dr. Jason Bynum, a child and adolescent psychiatrist for Kaiser, first medically diagnosed Student with a mood disorder, not otherwise specified, and polysubstance abuse in June 2012.  Upon her discharge, Student was sent to the Edgewood Center for Children and Families in San Francisco for two weeks of intensive residential treatment, family meetings, and therapy, and was discharged from Edgewood on June 20, 2012.

Student's therapist at Kaiser, Paula Adams, began providing individual therapy to Student twice a week in the summer of 2012 after her release from Edgewood.  The ALJ was persuaded by the evidence that Ms. Adams struggled to establish a relationship with Student for about a year.  The ALJ determined that Ms. Adams was persuasive, as was Dr. Bynum, that Student generally presented as "doing fine," when underneath she had suicidal, dangerous, and impulsive thoughts and undisclosed behaviors.  None of Student's medical professionals were able to identify any particular triggers or stressors.

On July 19, 2012, Student was admitted to Sierra Vista Hospital after having been placed on an involuntary psychiatric hold under Welfare and Institutions Code section 5150, for being a

danger to herself or others, due to severe depression and suicidal ideation.  Student had experienced a good day with her grandparents the day before, but then underwent a precipitous drop into suicidal ideation. Student was discharged the next day for outpatient follow-up at Kaiser.

For the fall of 2012, in tenth grade, Parents secured her admission into the Humanities International Study Program at McClatchy High School in Sacramento, an advanced program for gifted pupils.  They stated that they hoped it would provide Student with motivation to return to school.  McClatchy was a large comprehensive general education campus.  The ALJ found that Student experienced intense pressure to perform perfectly so she could go to college.  She was a general education pupil with no special education supports or services.  Student began having panic attacks at school and became overwhelmed emotionally and depressed.  Parents removed her after about a month and enrolled her in the independent study program at Choices Charter School ("Choices") in San Juan.  However, her parents concluded that program was not an appropriate educational environment for Student as she was alone at home for significant periods of unstructured time, when she should have been under adult supervision and engaged in structured activities.

On December 31, 2012, Student was admitted to Sierra Vista Hospital after she deliberately ingested a carpet cleaner solution, vomited, and called 911 for help.  At that time, Student was in tenth grade and enrolled at Choices, but it was closed for the winter break.  The hospital discharged Student on January 4, 2013, and she returned to intensive outpatient therapy at Kaiser.

On March 8, 2013, Student was admitted to Sierra Vista Hospital after being placed on a section 5150 hold.  Student stole $1,000 from her mother, took the mother's car intending to drive to New York, and drove as far as Nevada before Parents had law enforcement intervene.  She also purchased marijuana to sell during the trip.  On her return, Student demanded the right to be emancipated and threatened to kill herself.  On March 19, 2013, Student was discharged from Sierra Vista Hospital for further assessment and residential therapeutic treatment at Edgewood, including individual and family therapy.  Student was discharged from Edgewood on April 5,

2013.

On April 25, 2013, Student was again hospitalized at Sierra Vista Hospital after she attempted to run away to Europe.  She forged a letter from Parents, and obtained Mother's bank account information and a passport.  Student was discharged from the hospital on May 10, 2013.  During these hospitalizations, Parents learned that Student had been engaging in other risky and dangerous behaviors at home or in the community, including cutting herself, purging food, and doing illegal drugs.

*i.  April 2013 San Juan Assessment and May 2013 IEP Team Meeting*

On April 8, 2013, a San Juan school psychologist assessed Student and the results were reviewed at the May 2013 IEP team meeting.[4]  On standardized assessment tests for cognitive functioning, Student scored in the above average range.  On standardized academic tests, Student scored in the average or high average range in all areas.  However, Student was in the clinically significant range (showing severe mental health concerns) for depression, anxiety, conduct problems, low self-esteem, and significant social stress.  Primarily due to her hospitalizations that spring, Student's grades suffered.  Although she had an A in Honors English 2, she had a D+ in French 2, an F in Earth Science, a C+ in English 3.

At the May 1, 2013, IEP team meeting, held while Student was still hospitalized, San Juan found Student eligible for special education under the emotional disturbance category because she had a general pervasive mood of unhappiness or depression and inappropriate types of behavior or feelings under normal circumstances that adversely affected her educational performance over a long period of time and to a marked degree.  The IEP team determined that Student's disability affected her involvement and progress in the general curriculum due to multiple hospitalizations and absences from school.

Parents requested a residential treatment placement.  However, the school district members of the San Juan IEP team tentatively offered Student an educational placement, including the 2013 extended school year, at La Vista Center, a small therapeutic school for pupils with emotional disturbance.  Parents agreed to visit the school site, and the team agreed to

---

[4]     The legal sufficiency of these assessments is not at issue in this proceeding.

1   continue the IEP team meeting to complete the IEP.  Parents then canceled the visit.

2       At that time, Student had unique needs related to her educational disability in the areas of

3   safety (due to suicidal ideation); self-advocacy when overwhelmed, anxious, or fearful; mental

4   health, including depression and anxiety; attendance (when hospitalized); and postsecondary

5   transition to adult life, college, and career.

6               C.   2013 Extended School Year and June 2013 IEP

7       On May 13, 2013, Parents declined San Juan's proposed placement and chose not to

8   complete that IEP process.  Because Parents did not complete or consent to the San Juan IEP,

9   Student reentered Sacramento as a general education pupil without an IEP.  Sacramento had

10  attended the San Juan IEP team meeting and offered to immediately place Student at the Sierra

11  School at Eastern: Upper School (Sierra School), pending an IEP team meeting in June 2013, and

12  Parents agreed.

13      Sierra School is a nonpublic school in contract with Sacramento that provides specialized

14  instruction in a small campus environment, with a school-wide behavior management system and

15  therapists on staff.  Sierra School is a small school comprised of about 85 special education

16  pupils, of whom about 25 pupils were eligible for services under the emotional disturbance

17  category.  The high school program had about 12 pupils with special needs.

18      On June 5, 2013, Sacramento held an IEP team meeting.  At the time of this meeting,

19  Student's unique needs had not changed since the May 2013 IEP team meeting with San Juan.

20  She had been attending Sierra School in tenth grade since mid-May 2013 without incident.

21  Sacramento offered Student continued placement at Sierra School, including the extended

22  summer school, along with annual goals, weekly individual and group counseling sessions, a one-

23  to-one aide, and behavioral intervention and transition services, which are discussed in more

24  detail below.  Because Sacramento was concerned about the quality of the San Juan assessment,

25  Sacramento offered to reassess Student after the summer break.  Parents consented to the IEP but

26  stated that Student's mental health professionals had recommended a residential placement, and

27  requested a program review six weeks into the fall quarter at school.  The regular school year

28  ended two days later.

*i.      Extended School Year Academic Instruction*

Student does not contend that Sacramento's initial 30 day placement of her at Sierra School denied her a Free Appropriate Public Education ("FAPE").  She contends that Sacramento's June 2013 IEP denied her a FAPE beginning with the summer 2013 extended school year because it did not offer or provide her appropriate academic instruction.  For the special education extended school year, from June 17, to July 18, 2013, the IEP offered her 330 minutes of specialized academic instruction per day for 20 school days.  In addition, it offered her the same rate of daily specialized education for the 2013 – 2014 school year in eleventh grade.

For the June 2013 IEP team meeting, Student's teacher at Sierra School, Sara Williams, conducted a standardized academic assessment of Student.  On the standardized tests, Student's grade equivalency was 12.9 (twelfth grade, nine months) for reading comprehension, numerical operations, and math reasoning, and 10.8 (tenth grade, eight months) for spelling.  Her reading comprehension score was in the superior range.  By that point, Student had received transfer credits from San Juan, and was getting an A in all of her subjects (English 10, English 11, Algebra II, Fine Arts, and US History) at Sierra School.  Student was very bright and verbally expressive, and presented to the school staff as "exceptionally talented."

For the extended summer school year at Sierra School, Student was successful academically and received all A's in her subjects.  The ALJ found that the academic curriculum conformed to California standards.  However, the curriculum during the extended school year was designed to prevent special education pupils from regression as required by law and was not rigorous.  For many of the pupils, the curriculum was modified as they had more academic challenges.  The grades in Student's class were issued based on the quality and quantity of each pupil's school work, along with their attendance.

Student's teacher worked with her individually for 30 to 60 minutes each day on a one-to-one basis, and the ALJ determined there was no evidence her curriculum was substandard. Student was able to perform successfully in the academic curriculum in a cooperative, respectful and committed manner, and received educational benefit.  Student did not engage in any inappropriate emotional outbursts or behaviors or otherwise display signs of emotional

1   dysregulation with either peers or adults at school.

2          Dr. Paula Solomon was retained by Parents in late January 2013, reviewed Student's

3   records, observed her at Falcon Ridge, and observed one of Sierra School's classes in February

4   2013.  Dr. Solomon spent only a short time in the class at Sierra School, at a time when there

5   were few pupils and no structured activities.  She did not interview Student's teacher or therapist.

6   Dr. Solomon discounted Student's ability to function well and perform academically at school

7   with mental health supports outside of a residential placement, and claimed that Student could not

8   focus sufficiently on academic materials in order to receive an education.  The ALJ found this

9   opinion was persuasively contradicted by the testimony of Sacramento's witnesses from Sierra

10  School who worked with her daily and saw her engaged in the curriculum.

11         The ALJ determined that Student's claim that the academic instruction at Sierra School

12  was a "joke" reflected her depressed mental outlook as well as her probable misunderstanding

13  about the nature of the special education summer school program.  Indeed, Parents informed the

14  IEP team, and established at the hearing, that Student was prone to exaggeration and her

15  statements could not always be trusted.  In addition, the ALJ concluded that Student tended to

16  drive herself very hard and competitively in academics, which was often counterproductive as it

17  led to increased stress, anxiety, and fears of inadequacy. Consequently, if Sierra School's summer

18  academic curriculum was not as demanding as she would have preferred, it provided her a

19  sufficient learning environment in which to obtain educational benefit while receiving therapeutic

20  counseling and working on stabilizing her social emotional regulation, which were her primary

21  areas of need.

22         The extended school year curriculum supported keeping Student safe and avoiding

23  regression or deterioration in her mental health, and academics was not an area of need outside of

24  attendance.  The fact that there were pupils in Student's class who functioned at lower cognitive

25  levels demonstrated the diversity of the disabled population at the school and did not establish a

26  fatal defect in the academic program tailored for Student.  As found below, for eleventh grade,

27  Sacramento offered Student a more rigorous academic program in the September 2013 IEP.

28  However, that offer did not establish that the academic curriculum at Sierra School for the four-

1  week extended school year in the summer was inappropriate.

2          *ii.   Mental Health Therapy Services*

3        Student contends that the June 2013 IEP denied her a FAPE because it did not offer her

4  appropriate mental health therapy services for the extended school year or the beginning of

5  eleventh grade until her next IEP team meeting on September 27, 2013.  To support Student's

6  mental health needs, the IEP offered her annual mental health goals, individual and group

7  counseling, behavior intervention services, and a behavioral aide, discussed in detail below.  By

8  the time these services were offered, Sacramento and Sierra School staff had observed and

9  worked with Student for about 30 days.

10        Specifically, the IEP offered her an annual goal in the area of self-advocacy, and three

11  annual goals in the social emotional areas of self-esteem, safety, and self-talk.  Student's areas of

12  need addressed by these goals and her levels of functioning with respect to them were developed

13  based on the assessment and other information provided to Sacramento by Parents and San Juan.

14  The self-advocacy goal provided that when Student became overwhelmed, anxious or fearful, she

15  would initiate a conversation with a trusted staff member and respond positively to de-escalation

16  strategies.  The self-esteem goal worked on Student's ability to recognize and acknowledge

17  positive comments from others.  The safety goal was for Student to utilize on-campus supports,

18  and develop outside social supports and positive relationships as protective factors against her

19  persistent suicidal ideation.  The self-talk goal encouraged Student to engage in positive self-talk

20  and discuss strategies for increasing her self-image and engaging in future-oriented thinking.  The

21  IEP provided that Student's therapist at Sierra School was the primary staff responsible to work

22  with Student on her goals.

23        For the extended school year, the June 2013 IEP offered four 30-minute sessions of

24  individual counseling, and one group session of counseling and guidance.  The IEP offered

25  behavioral intervention services of 120 minutes of consultation during the extended summer

26  school from Learning Solutions, Behavioral and Educational Consultants, a nonpublic agency.

27  The IEP provided that Learning Solutions would also provide an instructional or behavioral aide

28  to accompany Student each day to address her safety needs.  The aide was instructed to be within

1   "earshot and eyesight" of all of Student's interactions on a daily basis, including using the

2   restroom, and report any occurrence of possible precursor verbal or physical behaviors, including

3   inappropriate comments, that would warn of emotional dysregulation.  The aide had a safety

4   crisis plan and mobile phone to swiftly intervene in an emergency.  The behavior support services

5   included data collection and a crisis plan, and allowed Student to take breaks throughout the

6   school day as needed.

7        As of the June 2013 IEP team meeting when the above offers were made, Sierra School

8   staff, including her therapist, perceived that Student typically appeared to be in a positive mood at

9   school and rarely appeared to be emotionally deregulated, and were impressed with her

10  intelligence and leadership qualities.  Student was very social with her peers, often acted as a

11  mediator in group situations, and there were no reports of self-harm, inappropriate statements or

12  suicidal ideation.  There were occasions when Student stated that she did not want to complete an

13  assignment, engaged in off-task behavior, and attempted to sleep in class.  Student's challenges at

14  school were primarily emotional in nature, whereas most of the school's other pupils had both

15  behavioral and emotional challenges.  However, Student presented uncontested evidence that she

16  was skilled at masking her true feelings.

17       Pursuant to the IEP, Student received school based counseling and therapy at Sierra

18  School from one of the school's therapists, Tara Peterson.  Ms. Peterson has provided counseling

19  to about 150 pupils with mental health needs, including 30 to 50 with suicidal ideation, and 15 to

20  20 who have been actively suicidal or placed on involuntary psychiatric holds. She has conducted

21  risk assessments and had called law-enforcement for that purpose.  During summer school,

22  Student's group therapy was a girls' process group, focused on increasing understanding, insight,

23  and self-awareness about one's own behavior and its impact on others.

24       From May 13, through the end of the regular school year on June 7, 2013, and from the

25  start of the extended school year on June 17, through July 18, 2013, the behavioral aide from

26  Learning Solutions did not observe Student engage in any emotional or behavioral incidents of

27  concern at school.  Nor were there any reportable concerns during the beginning of 11th grade

28  prior to September 9, 2013.

1    Ms. Peterson was persuasive that Student's overall participation and cooperation in the

2    therapy process was genuine.  For example, Ms. Peterson credibly established that many of

3    Student's private journal entries regarding the depth of her despair and depression did not surprise

4    Ms. Peterson because Student had shared those feelings with her during their therapy sessions.

5    Ms. Peterson wrote Student's goals for self-advocacy, self-esteem, safety, and self-talk, and

6    worked with Student on the goals on a regular basis.  Student struggled with low self-esteem and

7    negative self-talk, but Ms. Peterson noted some progress on the goals through the extended school

8    year and the beginning of eleventh grade.  The ALJ found that Ms. Peterson was persuasive that

9    Student was able to recognize when she engaged in negative self-talk and was able to work with

10   Ms. Peterson to develop strategies to focus more positively.

11   However, the ALJ determined that, while Student established a rapport with Ms. Peterson,

12   liked her, and disclosed sensitive matters to her individually and in the group counseling sessions,

13   Student did not establish a meaningful level of therapeutic intimacy with her by the beginning of

14   eleventh grade.  As an example, the ALJ noted that Student did not disclose to Ms. Peterson her

15   illegal drug use or other risky behaviors in her personal life, such as engaging in sexual conduct

16   outside of school.  However, this fact did not become apparent to Ms. Peterson or Sacramento

17   until the September 2013 assessment, as found below.

18   At the time Sacramento offered the above mental health therapy services and supports to

19   Student in the June 2013 IEP, Sacramento had observed and worked with Student for a month.

20   The ALJ found that Sacramento did not have reason to believe that she required more frequent or

21   different educationally related therapy in order to access and benefit from her education.  Nor did

22   the ALJ find evidence that Student's conduct during the extended school year provided any

23   objective indication that the services were not appropriate.  The ALJ concluded that the mental

24   health services and supports that Sacramento offered to Student were reasonably calculated to

25   provide educational benefit, meet her mental health needs, and keep her safe in the school setting

26   during that time.

27   //

28   //

11

1          *iii.*     *Individual Transition Plan*

2         Student contends that Sacramento denied her a FAPE because the June 2013 IEP failed to

3 offer her an appropriate individual transition plan.  After Student was made eligible for special

4 education and began attending Sierra School, the staff determined that she would like to go to

5 college and major in public relations as a career interest.  Eric Hernandez, a behavior intervention

6 specialist with Sacramento, drafted the individual transition plan that was presented to Student's

7 June 2013 IEP team with her stated postsecondary objectives in mind.

8         The transition plan offered to Student at the June 2013 IEP team meeting noted that she

9 needed to complete a career assessment.  Based on Student's desire to attend college and major in

10 public relations, the plan provided for a postsecondary educational goal to attend college, a

11 postsecondary employment goal to work part-time while attending college, and a postsecondary

12 independent living goal to live independently upon completion of school.  At the time this

13 transition plan was offered, Student had completed 130 credits toward graduation with 95

14 pending and was on track to graduate.  She had already passed the California High School Exit

15 Examination in English language arts and math.  The IEP offered Student 30 minutes monthly of

16 career awareness services, and career awareness activities were also embedded in the curriculum.

17 Student participated in an independent living skills class at Sierra School twice a week, with a

18 focus on social skills, daily living skills, and career exploration.

19         The plan included transition services to support each of these goals.  For example, for the

20 goal to attend college, the plan provided for Student to complete career research in her chosen

21 career of interest, complete her last two years of high school, and take tours of colleges.  For

22 independent living, Student was to work on a budget and explore different living options.  For

23 employment, Student would complete a career assessment, do career research, and learn skills

24 related to completing applications, along with industry tours.  The IEP also included an annual

25 goal in the area of career exploration, noting that Student had not engaged in career exploration

26 activities to date in order to research jobs of interest.

27         The ALJ observed that Student was critical of the individual transition plan because it did

28 not include any goals or services to help her advocate for mental health services after high school,

1    or to understand her underlying mental health issues.  However, the individual transition plan was

2    part of Student's June 2013 IEP, which included self-advocacy and multiple social emotional

3    goals to support her mental health needs.  The ALJ found that Mr. Hernandez was persuasive that

4    Student's transition plan for the 2013 extended school year and the beginning of eleventh grade

5    provided her the foundational skills in postsecondary planning that would be further developed as

6    she entered her twelfth grade year.  In addition, Sacramento's Workability program visited the

7    campus to provide services related to postsecondary goals including job searches and college

8    tours.  Therefore, the ALJ determined that Defendants did not establish that Sacramento's

9    transition plans violated the law.

10                    D.  2013–2014 School Year to the September 27, 2013 IEP Offer

11           As discussed above, for the start of the 2013-2014 school year in eleventh grade, the June

12    2013 IEP offered continued placement at Sierra School with specialized academic instruction,

13    mental health therapy services, a one-to-one aide, and behavioral intervention and transition

14    services.  Student contends that the placement, instruction, mental health therapy services and

15    supports, and the transition plan continued to deny her a FAPE.

16                            i.      Academic Instruction

17           After Student's eleventh grade year began on August 19, 2013, Student continued to

18    receive specialized academic instruction pursuant to the June 2013 IEP.  The ALJ found that

19    Student's classes conformed to the state curriculum for eleventh grade.

20           However, while the academic curriculum for the extended school year program was

21    adequate to prevent Student's regression during that time period, the ALJ determined that for

22    eleventh grade Student was entitled to a higher level of academic rigor commensurate with her

23    abilities.  The ALJ concluded that Sacramento was therefore required, based on its knowledge of

24    her academic success, to convene an IEP team meeting and consider other academic options for

25    eleventh grade.  Sacramento had agreed to revisit Student's IEP within six weeks of the start of

26    the fall school year at Parents' request. Student was hospitalized at Sierra Vista Hospital on

27    September 10, 2013.  Thereafter, Sacramento assessed Student and reconvened an IEP team

28    meeting on September 27, 2013.  At that time, Sacramento offered Student a higher level of

academic instruction at another school, discussed in more detail below.  Sacramento had already

planned to reassess Student after the start of the new school year.  Sacramento timely assessed

her, and convened the September 2013 IEP team meeting.

<em>ii.      Mental Health Therapy Services</em>

For the beginning of the eleventh grade school year at Sierra School, the June 2013 IEP

offered Student 30 minutes of individual counseling 30 times, for a total of 900 minutes (about

once a week).  In addition, the IEP offered group counseling and guidance sessions for 160

minutes per month during the school year (40 minutes a week).

At the beginning of eleventh grade, Ms. Peterson led a girls' "think confident" group in

which Student participated weekly, focusing on cognitive behavioral therapy to change one's

thinking patterns and create a more positive self-image.  The group learned tools and

interventions including peer feedback and social skill exercises.  Ms. Peterson also continued to

provide individual therapy to Student once a week.  Student had perfect attendance in therapy,

was engaged in the conversations, and offered appropriate feedback to others.  In addition, Ms.

Peterson saw Student daily on campus and was available as needed.  The behavioral intervention

services were for 120 minutes of monthly consultation, along with the continued daily presence of

the behavioral aide.

On September 9, 2013, Student had ingested cocaine at home during the night or before

school started.  The aide reported that Student arrived at school exhibiting very "hyper" behaviors

(fidgeting, pacing, and talking fast), reported she hadn't slept, was exhausted and sick, and asked

to call Father, who told her to stay at school.  Student later informed the aide she felt like crying

and requested to speak with the counselor, Ms. Peterson.  Student did not disclose to Ms. Peterson

that she was coming down from using cocaine but shared that she was concerned and ill.  Ms.

Peterson conducted a risk assessment, concluded that Student was not at risk for suicide but

provided her with a suicide hotline number just in case, and contacted Father, who directed

Student to go to her grandparents' home.  Mother picked Student up and brought her to a Kaiser

Hospital emergency room for drug testing.  Mother found Student's journal, read through some of

it, and discovered Student had snuck out of the home and engaged in sex with someone known to

1    Mother.  She also found a recent journal entry in which Student expressed feelings of

2    hopelessness and suicidal ideation, and informed the hospital.  The hospital admitted Student to

3    Sierra Vista Hospital Student on a section 5150 involuntary psychiatric hold.  Aside from the

4    journal entry, there was no other evidence of suicidal ideation at the time of hospitalization.

5           Student remained in the hospital for a month.  On September 18, 2013, Parents provided

6    Sacramento with written notice that they intended to unilaterally place Student in a residential

7    treatment center and seek reimbursement.  October 4, 2013, Parents transferred Student from the

8    hospital to Falcon Ridge in Utah.

9           The ALJ concluded that, based on San Juan's assessment information, and Student's

10   performance at school from May through September 8, 2013, the mental health therapy services

11   offered in the June 2013 IEP supported Student's ability to be academically and socially

12   productive in the school setting over the summer because she received school-based therapy for

13   the first time under an IEP.  Sacramento had already offered to reassess Student after the summer

14   break and followed through with that plan.  Thus, the ALJ concluded that Student's sudden

15   hospitalization did not establish that Sacramento should have revisited the services at an IEP

16   meeting any earlier than September 27, 2013.  However, the ALJ concluded that this

17   hospitalization required Sacramento to review Student's levels of performance and IEP services.

18                     E.  September 2013 Assessment and September 27, 2013 IEP Offer

19                          i.       September 2013 Psychoeducational Assessment

20          While Student was hospitalized, Sacramento obtained Parents' consent to conduct another

21   assessment because Sacramento felt San Juan's assessment did not provide them with sufficient

22   information in light of Student's hospitalization.  Beginning on September 13, 2013, Sacramento

23   school psychologist Sara Pieschl, school social worker Maria Lopez, and behavior intervention

24   specialist Eric Hernandez conducted a multidisciplinary psychoeducational assessment.  This

25   team was part of Sacramento's educationally related mental health services division in the special

26   education department.  They interviewed many people, including Dr. Bynum,[5] Ms. Adams, and

---

27   [5]       At this interview, Dr. Bynum informed Sacramento that he changed his diagnosis of Student on September
     2013.  Because of changes in diagnosis guidelines, Dr. Bynum diagnosed Student with a borderline personality
28   disorder, involving chronic emotional lability, impulsivity, mood swings, and suicidality.

other Kaiser and Sierra Vista hospital personnel, Parents, Ms. Peterson, and Student, reviewed her school records, and administered a battery of standardized assessment tests and social, emotional, and behavioral rating scales.

Sacramento's assessment team visited Student at the hospital to assess her, during which Student stated that, in her opinion, the hospital was "a holding cell," not a therapeutic environment. Dr. Bynum viewed Student's recent conduct as a precursor to further self-harm and Sacramento was informed that Student tried to choke herself in the hospital. Dr. Bynum candidly admitted that he cooperated with Parents in September 2013, to retain Student at Sierra Vista Hospital to keep her safe until Parents located a residential treatment placement and that process took a month.

Sacramento's multidisciplinary team recommended that Student remained eligible for special education under the category of emotional disturbance with the same areas of concern found by the San Juan assessment. The assessors noted that there was mixed information regarding the adverse impact of Student's disability on her educational performance. While they acknowledged that her "engagement in the school environment has been limited due to frequent hospitalizations due to mental health needs," they noted Student had passed every class in high school, passed the California High School Exit Exam, was at or above grade level according to academic achievement testing, and met or exceeded all classroom expectations. However, the assessment data found that Student had elevated levels of depression, ineffectiveness, and sense of inadequacy, and would therefore benefit from educationally related mental health services in the school. The assessors did not make any recommendation regarding residential placement, but left that discussion to the IEP team.

Based on the behavior data collected, Ms. Pieschl determined that Student did not require a behavior support plan in her IEP because her problems were emotional and not behavioral in nature within the school setting. Student's scores on the assessment tests were consistent with those obtained by the San Juan assessment, except that for written expression Student scored in the very superior range. Parents and Student rated her behaviors primarily in the at-risk or clinically significant range based on Student's behaviors at home or in the community. However,

1   Sierra School staff primarily rated her behaviors within the average range because Student did not

2   manifest any significant concerns at school.

3                          ii.      *September 2013 IEP Offer*

4          On September 27, 2013, Sacramento held an IEP team meeting to review the

5   multidisciplinary assessment results, which lasted over three and a half hours.  In addition to

6   Parents, Student participated in the IEP team meeting by telephone from the hospital for a few

7   minutes and expressed a desire to have more rigorous academic classes, as she did not feel

8   challenged by the academics at Sierra School.  Dr. Bynum also participated by telephone, and

9   recommended a residential treatment center placement for Student.  The ALJ determined that, at

10  the time of this IEP team meeting, Student had unique needs in the areas of interpersonal

11  communication, self-advocacy, mental health, self-worth and self-esteem, planning and task

12  completion, safety, attendance, and postsecondary college and career exploration.

13         After considering all factors, including Parents' concerns, Sacramento did not offer

14  Student a residential treatment placement.  Instead, the September 2013 IEP offered Student new

15  annual goals; a dual educational placement at both Sierra School and George Washington Carver

16  School (Carver); continuation of a one-to-one aide for her safety purposes, continuation of her

17  mental health therapy and supports, the addition of mental health services at Carver, and a new

18  individual transition plan.  These offers are discussed in more detail below.

19                          a.      Eleventh Grade Academic Instruction

20         Student contends that the September 2013 IEP's offer of mental health services was

21  inappropriate to provide her with educational benefit because she needed more intensive services

22  and supports.  After school started in August 2013, Student had begun displaying some minor

23  erratic behaviors at school by utilizing periodic breaks that were provided for her as an

24  accommodation in her IEP, due to her self-reported frustrations with some peers.  In addition, her

25  teacher had seen an increase in some manipulative and staff splitting behaviors in her attempts to

26  converse with peers from other classrooms.  At the September 2013 IEP team meeting, however,

27  the ALJ determined that Sacramento had significant new information and changed circumstances

28  to consider, including Student's use of an illegal drug in the home environment, appearance at

1   school under the influence of the drug on September 9, 2013, subsequent hospitalization, and

2   Sacramento's assessment results, including detailed information from Student's private medical

3   providers.

4       The IEP offered Student multiple annual goals derived from the assessment data in the

5   areas of interpersonal communication, self-worth, planning, task completion, strategies to

6   overcome low self-esteem, and identifying and reframing feelings of hopelessness.  For the

7   interpersonal communication goal, Student would recognize and acknowledge positive comments

8   from staff and peers, and respond with positive statements.  The self-worth goal provided that

9   Student would be able to use strategies to identify the point in an event or project where her

10  negative thinking would interfere with its completion.  The IEP offered a goal for Student to be

11  able to identify situations and relationships that have contributed to her low self-esteem and be

12  able to develop and implement constructive strategies to overcome them within the safety of her

13  therapy sessions.  To address Student's sense of hopelessness, the IEP offered a goal for her to

14  identify feelings of hopelessness and learn to reframe them into statements of self-empowerment.

15  Student's therapists were responsible for implementing most of these goals, and Student's

16  teachers were responsible for implementing the planning and task completion goals.  While there

17  was no evidence that Student suffered from emotional dysregulation or suicidal ideation in the

18  school environment, her mental state of health was educationally related and these IEP goals were

19  designed to improve her ability to function on a daily basis, avoid hospitalization, and receive

20  educational benefit.

21      The September 2013 IEP offer continued Student's counseling at Sierra School with Ms.

22  Peterson at the same rate as that in the June 2013 IEP: one session of individual counseling for 30

23  minutes, and one session of group counseling 40 minutes per week.  In addition, the IEP added

24  two 30-minute sessions of individual, educationally related mental health counseling at Carver

25  each week to support her mental health needs on that campus with the intent to provide continuity

26  of support on her IEP goals.  The IEP also offered 30 minutes weekly of ongoing consultation

27  between Student's family, Sacramento's educationally related mental health team, the Sierra

28  School therapist, and Student's private medical mental health team.  Hence, the IEP offered

18

1    Student three individual counseling sessions per week, one at Sierra School and two at Carver

2    with two different therapists; one group therapy session per week at Sierra; and 30 minutes of

3    weekly consultation among all of Student's educational and medical providers and family.

4        Both Ms. Peterson, Student's therapist at Sierra School, and Mary Bourgeois, a

5    Sacramento school psychologist in the educationally related mental health services division,

6    believed that Sacramento's offer to have Student receive mental health therapy from two different

7    therapists at two different schools was workable and would not hinder Student's receipt of

8    adequate mental health therapy.  If Student attended Carver, Ms. Bourgeois would provide her

9    mental health therapy services there.  Both therapists were confident that regular communication

10   and consultation between them would work, and would avoid Student's manipulation of them, or

11   engaging in "splitting" behaviors by giving inconsistent information to each of them.

12       However, the ALJ determined that they did not establish that such an arrangement would

13   be therapeutically advisable or effective for Student, whose ability to share confidential

14   information with a trusted therapist would be compromised. First, the ALJ observed that Student

15   had already demonstrated avoidance of sharing her thoughts with the behavioral aide, because

16   Student understood that whatever she said or did would be reported. Second, the ALJ found that

17   Sacramento should have understood by then that Student did not establish a meaningful level of

18   therapeutic intimacy with Ms. Peterson by the beginning of 11th grade, and had not established

19   sufficient trust with Ms. Peterson to engage in intensive disclosure of her deepest needs and

20   anxieties. Consequently, the ALJ concluded that adding another therapist was problematic.

21       The ALJ found that the evidence established that Sacramento offered Student mental

22   health therapy services at Carver because she required therapy there to be placed on that campus,

23   not because the school district believed she required more intensive mental health therapy support

24   in general.  The ALJ further determined that Sacramento staff viewed Student's hospitalization as

25   involving her conduct outside of school including drug use.  The ALJ concluded that view

26   overlooked the school district's responsibility to offer and provide meaningful and effective

27   therapy in the complex areas of mental health and self-worth.

28       The ALJ observed that Ms. Adams was critical of Sacramento's offer to have an

19

1  educationally related mental health therapist work with Student at Carver, in addition to her

2  therapy work with Ms. Peterson at Sierra School, and her criticism was persuasive.  The ALJ

3  found Ms. Adams persuasive that Student was able to mask what she was really feeling and

4  highly resistant to allow for a more intimate therapeutic relationship necessary for effective

5  therapy. Ms. Adams was not aware of Sacramento's plan to have weekly consultations between

6  the therapists and the family, including her.  Nevertheless, the ALJ determined that, given the

7  fragility of Student's mental health, anxiety, depression, and sense of hopelessness, Ms. Adams

8  was persuasive that it would be extremely difficult and challenging for Student to establish an

9  effective therapeutic relationship with two separate therapists at two schools, plus continue with

10  her or another private therapist at Kaiser, and that Student was capable of manipulating all of

11  them. Given Ms. Adams' extensive outpatient therapy with Student since 2012, her opinion on

12  this point was entitled to great weight.

13  　　　In addition, the ALJ concluded Ms. Adams established that Student was at a high risk

14  precisely when she was doing well, because her downward spirals into self-harm were sudden and

15  unpredictable.  On September 25, 2013, both Ms. Pieschl and Ms. Lopez interviewed Ms. Adams

16  during the assessment process.  Ms. Adams informed them in no uncertain terms that, over the

17  period in which she had been providing therapy, Student would attend and participate in therapy

18  regularly, appear to be compliant, and then engage in sudden self-harming behavior shortly

19  thereafter.  Ms. Adams's concern that Sacramento did not understand the severity of Student's

20  mental health needs and suicidality was valid given the scope of the September 2013 offer for

21  limited and fractured mental health supports.

22  　　　The ALJ found that Ms. Adams was persuasive that Student required one experienced

23  therapist to provide her with effective counseling.  The ALJ concluded that Ms. Adams' opinion

24  on this point was more persuasive than that of Ms. Peterson, who did not have much experience

25  and seemed to take Student's statements and demeanor at face-value, without realizing the extent

26  to which Student successfully masked her inner turmoil and had sudden declines.  Moreover, the

27  ALJ considered that Ms. Peterson had failed to follow through in arranging communication with

28  Ms. Adams during the extended school year, suggesting that the proposed design for weekly

consultation among all players would be problematic.  In addition, based on the detailed information from Dr. Bynum and Ms. Adams, the ALJ found that Sacramento should have realized that Student's apparent progress socially and emotionally was fragile, if not illusive, and required more intensive supports.

Dr. Solomon was critical of Sacramento's September 2013 offer of mental health services because, in her opinion, Student needed group counseling on a daily basis, along with individual and family counseling from an experienced therapist in a residential treatment setting.  Dr. Solomon believed that Student fit the profile for a bipolar disorder, a disorder with lengthy periods of grandiosity and depressive states.  Dr. Solomon recommended that Student should be in the "container" of a residential treatment center placement and did not think that Student had the coping skills to function outside of that structured placement when things go wrong.  The ALJ noted that, while Dr. Solomon was mistaken in thinking that Sacramento did not offer Student group therapy, which she needed for accountability, the ALJ found Dr. Solomon persuasive that, overall, Student required daily mental health supports to progress.  The ALJ felt Dr. Solomon's opinion as to the level of placement required was based on a clinical evaluation of what Student needed medically to treat her illness.  Nevertheless, the ALJ found her persuasive that Student required more intensive therapy from an experienced therapist, rather than two different therapists at two different school locations with no structure for daily therapeutic supports.

Based on the foregoing, the ALJ concluded that Sacramento's September 2013 IEP offer of mental health therapy services to Student was insufficient to support her receipt of meaningful educational benefit because the IEP offered a fractured structure of therapy divided between two schools and two therapists, which created unacceptable risks that Student's mental health needs would not be adequately met.  While the number of weekly counseling sessions may have been adequate, the ALJ determined that the offer also failed because there was no structure of daily therapeutic supports to help Student work meaningfully on her mental health and social emotional goals on a daily basis.  The ALJ concluded that, because Sacramento denied Student a FAPE by not offering sufficient mental health therapy services in this IEP, Student is entitled to relief.

//

1                                     **b.   Eleventh Grade Individual Transition Plan**

2         Student contends the individual transition plan Sacramento offered at the September 2013

3  IEP team meeting denied her a FAPE.  Mr. Hernandez was part of the educationally related

4  mental health services team that assessed Student while she was in the hospital, was cognizant of

5  her significant mental health needs, and proposed a revised plan.

6         The revised plan identified the specific colleges Student was interested in attending and

7  added appropriate transition services, including completing a career exploration assessment

8  online, attending college workshops, researching "job families" related to her interests, and

9  interviewing professionals within those areas of interest.  The IEP offered two postsecondary

10  goals, one for specified research in the areas of specific college admissions requirements,

11  applications, and financial aid or scholarships; and an employment goal to research possible jobs,

12  internships, and volunteer opportunities.

13         The ALJ observed that Student was again critical of the individual transition plan because

14  it continued not to include any goals or services to help her advocate for mental health services

15  after high school, or to understand her underlying mental health issues.  However, the individual

16  transition plan was part of Student's IEP, which included multiple goals to support her mental

17  health needs.  In addition, during 11th grade, both at Carver and Sierra, Sacramento's Workability

18  program was on campus to provide services related to postsecondary goals including job searches

19  and college tours.  The ALJ determined that Student did not present any evidence that

20  Sacramento's transition plans violated the law.

21        **III.**    **APPLICABLE LAW**

22         The IDEA requires that all states receiving federal funds for education must provide

23  disabled school children with a FAPE.  20 U.S.C. § 1412(a)(1)(A).  The FAPE, consisting of

24  special education and related services provided at no cost to the child's parent or guardian, must

25  meet state educational standards and be tailored to the child's unique needs through development

26  of an IEP.  20 U.S.C. § 1401(9).  The IEP is a written statement for each child that is developed

27  and revised each year by a team comprised of the child's parents, teachers and other specialists.

28  20 U.S.C. § 1401(14); § 1414(d)(1)(B).  Although the IDEA does not require school districts to

1   provide special education students with the best education available, or provide instruction

2   services that maximize a student's abilities, the IEP must be reasonably calculated to provide the

3   student with some educational benefit. *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v.*

4   *Rowley*, 458 U.S. 176, 198–200 (1982).  School districts are required to provide a "basic floor of

5   opportunity" and make available, on an individualized basis, such specialized instructional and

6   related services necessary to provide the requisite educational benefit.  *Id.* at 201.

7        Parents who believe that a public school system is not providing a FAPE may unilaterally

8   remove their disabled child from the public school, place him or her in another educational

9   institution, and seek tuition reimbursement for the cost of the alternate placement.  20 U.S.C. §

10  1412(a)(10)(C); *Burlington Sch. Comm. v. Dep't of Educ.*, 471 U.S. 359, 374 (1985).  Parents are

11  entitled to reimbursement, however, only if the court concludes both that the public placement

12  violated IDEA and the private school placement arranged by the parents was proper under the

13  Act.  *Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 15 (1993).   Even then, the Court

14  retains discretion to reduce a reimbursement award if the equities so warrant.   *Forest Grove Sch.*

15  *Dist. v. T.A.*, 557 U.S. 246–47 (2009).  Costs incurred by parents in such alternative placements

16  may also be reduced or denied if parents fail to provide timely and sufficient notice of the

17  placement to the school district.  *Id.* at 247.  Parents must provide notice of the parents' actual

18  intent to place the student elsewhere either at the most recent IEP team meeting attended by the

19  parents before removing their child from public school, or in writing at least ten business days in

20  advance of the placement.  20 U.S.C. § 1412(a)(10)(C)(1)(bb); 34 C.F.R. § 300.148(d).

21  Reimbursement demands may also be reduced or denied upon a judicial finding of

22  unreasonableness with respect to placement actions taken by parents.  34 C.F.R. § 300.148(d).

23  Indeed, in fashioning discretionary equitable relief under the IDEA, the court must "consider all

24  relevant factors."  *Florence County*, 510 U.S. at 16.

25        An IEP is evaluated in light of the information available to a district at the time it was

26  developed; it is not judged in hindsight.  *Adams v. State of Oregon*, 195 F.3d 1141, 1149 (9th Cir.

27  1999); *see also Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 992 (1st Cir. 1990) ("An IEP is

28  a snapshot, not a retrospective.").   The IEP must be evaluated in terms of what was objectively

1    reasonable when it was developed.  *See Roland M*, 910 F.2d at 992.  "Actual educational progress

2    can (and sometimes will) demonstrate that an IEP provides a FAPE.  But to impose the inverse of

3    this rule−that a lack of progress necessarily betokens an IEP's inadequacy− would contradict the

4    fundamental concept that '[a]n IEP is a snapshot, not a retrospective.'" *Lessard v. Wilton*

5    *Lyndeborough Coop. School Dist.*, 518 F.3d 18, 29 (1st Cir. 2008).  Thus, to determine whether a

6    school developed adequate plans to offer Student a FAPE, the Court must consider the

7    circumstances surrounding the formulation of the proposed plans.

8            **IV.    STANDARD OF REVIEW**

9            Courts reviewing an IDEA due process appeal must review the records of the

10   administrative proceedings; hear additional evidence at the request of a party; and grant such

11   relief as it deems appropriate, basing its decision on the preponderance of the evidence.  20

12   U.S.C. § 1415(i)(2)(C).  The preponderance of evidence standard is not, however, an invitation

13   for reviewing courts to discount the administrative proceedings.  *Bd. of Educ. of the Hendrick*

14   *Hudson Central Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982).  Instead, reviewing courts must

15   give due weight to an administrative decision's findings of fact and avoid substituting their

16   opinions of sound educational policy for those of school authorities.  *Id.*  While reviewing courts

17   determine for themselves how much deference is due, they must carefully consider administrative

18   findings and assess whether they are "thorough and complete."  *Capistrano Unified School Dist.*

19   *v. Wartenberg*, 59 F.3d 884, 891 (9th Cir. 1995).  "The amount of deference accorded the hearing

20   officer's findings increases where they are 'thorough and careful.'"  *Id.* (citing *Union Sch. Dist. v.*

21   *Smith*, 15 F.3d 1519, 1524 (9th Cir. 1994)).  All other findings may be accepted or rejected in the

22   court's discretion.  *Id.*

23           **V.    ANALYSIS**

24                   A.  Sacramento's Motion for Summary Judgement

25           Sacramento has filed a motion for summary judgment before this Court, asserting that the

26   ALJ improperly concluded that Sacramento should have provided services beyond what was

27   necessary for Student to benefit from her education.  (ECF No. 18 at 5.)  Specifically, Sacramento

28   argues that the ALJ applied an incorrect legal standard and required that Sacramento provide

1  greater services than necessary for Student to benefit from her education.  (ECF No. 18 at 15.)

2  Defendants responded by asking this Court to uphold the ALJ's decision and to order various

3  forms of relief on Defendants' counterclaims.  (ECF No. 19 at 31.)

4  *i.   Legal Standard Applied by the ALJ*

5  Sacramento argues that the ALJ applied an inappropriate standard by requiring that

6  Sacramento address Student's mental illness on a fundamental therapeutic level.  (ECF No. 18 at

7  20.)  Sacramento asserts that a school district is required to provide only a "basic floor of

8  opportunity" that provides "personalized instruction with sufficient support services to permit the

9  child to benefit educationally from that instruction."  (ECF No. 18 at 17 (citing *Rowley*, 458 U.S.

10  at 203).)  Sacramento further asserts that the Ninth Circuit has "drawn a bright line between the

11  educational needs and medical needs that would be necessary regardless of a student's

12  educational needs."  (ECF No. 18 at 18 (citing *Clovis Unified Scho. Dist. v. Cali. Office of Admin.*

13  *Hearings*, 903 F.2d 635 (9th Cir. 1990).)

14  Sacramento states that Student received an educational benefit from her IEP and takes

15  issue with the ALJ's finding that "progress is not obtained merely by having Student superficially

16  act appropriately in school, but for her to benefit at a fundamental therapeutic level."  (ECF No.

17  18 at 20 (citing AR 1114).)  Sacramento argues that the law does not require an IEP to maximize

18  a student's education nor to make a student's educational benefit the same as the benefit received

19  by a non-disabled child.  (ECF No. 18 at 21.)  Rather, Sacramento reasons a school is only

20  obligated to provide an educational benefit.

21  While Sacramento correctly sets forth the legal requirements, the Court finds that the ALJ

22  is correct that Sacramento did not meet the requirements of *Rowley* and its progeny.

23  Sacramento's selective excerpts of the ALJ's findings do not put forth the entire picture.  The

24  ALJ held that Sacramento itself identified that Student's emotional needs were interrelated to her

25  educational ones, stating that:

26  
27  
28  
> Student's educationally related mental health goals in the September 2013 IEP
> were offered to address her needs in vital social emotional areas related to her
> mental health, including interpersonal communication, and learning strategies to
> move from feelings of hopelessness to feelings of value and self-worth on a daily
> basis. Sacramento determined that these needs were educationally related. Progress

1
2

on the goals is therefore an IEP expectation. That progress is not obtained merely by having Student superficially act appropriately in school, but for her to benefit at a fundamental therapeutic level.

3

4

AR 1114.  The ALJ makes clear that "educational benefit" in this sense does not mean an

5

educational benefit identical to a student without disabilities, but a benefit that is more

6

than "superficial" and is in line with the goals determined by the school district itself

7

within the IEP. *Seattle Sch. Dist. No. 1 v B.S.*, 82 F.3d 1493 (9th Cir. 1996) (a child's

8

education needs encompass social and emotional needs).   The ALJ's comment that

9

Sacramento needed to provide services that allowed Student to benefit "on a fundamental

10

therapeutic level" was not the legal standard applied, but rather was the measure of what

11

type and intensity of services Student required in order to receive educational benefit.

12

*Adams v. Oregon*, 195 F.3d 1141, 1149 (9th Cir. 1999) (instructing the court to consider

13

the IEP goals and "ask whether these methods were reasonably calculated to confer [the

14

student] with a meaningful benefit.").

15

Sacramento further supports its claim that the ALJ applied an incorrect standard by

16

pointing the Court to *Ashland Sch. Dist v. Parents of Student E.H.*, 587 F.3d 1175 (9th

17

Cir. 2009.)   In that case, an ALJ's decisions was overturned where the ALJ ordered

18

reimbursement for residential placement but the Court determined that the residential

19

placement was made for primarily medical and not educational purposes.  (ECF No. 18 at

20

22.)   Sacramento's comparison to this case only further indicates that they have

21

misinterpreted the ALJ's findings in this case.  Irrespective of the Defendants' motives for

22

seeking residential placement, the facts clearly indicate that Student's educational benefit

23

was substantially intertwined with her mental state.  AR 1114.  The record makes clear

24

that the goal of Student's therapy was not to simply prevent superficial outbursts at school

25

and at home, but to address underlying issues that prevented Student from taking

26

advantage of any educational benefit provided by her IEP.  The Court does not find this

comparison persuasive.

27

Sacramento also argues that, had the ALJ applied the appropriate standard,

28

1   Sacramento's placement options would have been appropriate.  However, the Court need

2   not and should not engage in a re-review of Student's placement options.  The Court is

3   instructed to review the administrative proceedings and avoid substituting its opinions of

4   sound education policy for those involved in the administrative review process.  *Rowley*,

5   458 U.S. at 206.  Here, the Court finds that the ALJ applied the appropriate standard to the

6   facts and therefore declines to revisit Sacramento's restatements of its argument in favor

7   of its placement policy.

8         Finally, Sacramento maintains that the ALJ erred in concluding that Sacramento was

9   required to provide sufficient services to prevent Student from being hospitalized.  (ECF No. 18

10   at 26.)  While the Court agrees that perhaps the wording in the ALJ's decision summary is

11   unclear, a comprehensive review of the administrative record indicates that the ALJ imposed no

12   such requirement.  Sacramento protests the ALJ's statement:

13

14   > Regardless of where Student's acts of self-harm occurred, it was incumbent upon
   > Sacramento to offer intensified mental health services for Student to work daily on
   > her underlying mental health and social emotional needs, make meaningful

15   > progress in those areas, and *avoid a continued cycle of repeated hospitalizations
   > and resulting loss of educational benefit*.

16

17   AR 1115 (emphasis added).  This statement should not be viewed in isolation.  In the Court's

18   reading of the facts, the thrust of the ALJ's analysis was whether Student could receive an

19   educational benefit from a FAPE that did not address Student's mental health concerns in a

20   meaningful way.  The ALJ determined that Sacramento itself found that Student's mental health

21   concerns were part and parcel of an effective IEP plan and were therefore enumerated as goals

22   within her IEP.  *See* AR 1115 ("Because Student's fundamental mental health needs were

23   educationally related, Sacramento was not entitled to wait until Student acted out in school to

24   increase the intensity of the related service.").  The reality is that the ALJ never indicated that

25   Sacramento was required to provide Student with residential placement or keep Student from

26   being hospitalized, rather the ALJ found that Sacramento failed to address Student's needs by

27   treating Student's mental health as a superficial problem after having identified consistent therapy

28   as part of Student's educational goals.  Student's hospitalization was merely evidence to the ALJ

1   that Sacramento's dual placement offering was not reasonably calculated to provide an

2   educational benefit.

3

4                          *ii.   Material Factual Errors by the ALJ*

5           Sacramento argues the ALJ relied upon significant factual errors in her determination and

6   that these errors should prompt the Court to give less deference to the ALJ's findings.  (ECF No.

7   18 at 27.)  The ALJ stated as follows:

8               Student's experts were also persuasive that she needed mental health therapy
                supports in some form on a daily basis but none were offered. The fact that
9               Student hid or masked her feelings meant that Sacramento could not rely on
                Student to self-report, and needed to work with her on a more intensive therapeutic
10              level, particularly in regard to transitioning between home and school. There was
                no provision in the offer for any more than 30 minutes of weekly consultation
11              among all of the proposed mental health parties, including the family and
                Student's private therapist. For example, Sacramento did not establish how
12              Student would be expected to work daily on a self-esteem goal without direct daily
                access to a confidential therapist, rather than the classroom teacher.

13
    AR 1114.  Sacramento objects to this finding, stating that Student "would receive four therapy
14
    sessions per week, daily placement in a therapeutic setting at Sierra School, and daily access to a
15
    therapist as needed." (ECF No. 18 at 28.)
16
            With this objection, Sacramento glosses over facts that are clearly pertinent to this case.
17
    Clearly, the ALJ was aware that Student would have access to four therapy sessions per week.
18
    *See* AR 1103.  However, the ALJ's statement is based on her factual finding that those therapy
19
    sessions would be split between two schools and at least two different therapists and that one of
20
    those therapy sessions would be in a group setting.  AR 1103.  Based on the ALJ's review of
21
    Student's needs, the ALJ found that this type of approach would not be effective for Student.
22
    Sacramento's contention that this is a factual misstatement rather than a difference in
23
    interpretation of the facts is disingenuous. In any event, the Court finds that it is an insufficient
24
    justification for the Court to grant less deference to the ALJ's determination.
25
            Sacramento further states that the ALJ made a factual error by relying on the testimony of
26
    Paula Adams, Student's private therapist, who stated that there was a communication problem
27
    with one of Student's school therapists that Ms. Adams believed would make therapy ineffective
28

1    for Student.  (ECF No. 18 at 27–28.)  Sacramento argues that it was actually Ms. Adams who was

2    difficult to get in touch with and that Student's school therapists recognized the importance of

3    collaboration.  (ECF No. 18 at 28.)  Sacramento states that the ALJ ignored that Student's two

4    school therapists intended to consult for thirty minutes every week.  (ECF No. 18 at 28.)

5    Sacramento further argues that the ALJ improperly discounted the testimony of Ms. Peterson, one

6    of Student's school therapists, and insists that Student's therapeutic relationship with Ms.

7    Peterson was better than the ALJ found it to be.  Sacramento maintains that the ALJ's tendency to

8    discount these facts indicates that her decision was based on "unsupported speculation."  (ECF

9    No. 18 at 28.)

10        These arguments are tiresome attempts to chip away at the reasoning of the ALJ.  The

11   truth of the matter is that the ALJ produced a decision of 39 pages.  The Court found her analysis

12   to be "thorough and complete" as required by the Ninth Circuit.  *Capistrano Unified School Dist.*

13   *v. Wartenberg*, 59 F.3d 884, 891 (9th Cir. 1995).  It is simply not the role of the Court to discount

14   the ALJ's findings of fact simply because Sacramento can point to singular instances where it

15   believes that the evidence supports a conclusion in the opposite direction.  *Rowley*, 458 U.S. at

16   206.  Sacramento has pointed to nothing more than differences in opinion in the persuasiveness of

17   certain witnesses over others.  Because the Court has found that the ALJ's reasoning was

18   thorough and careful, it is not at liberty to simply accept or reject those findings based on the

19   differing view of the appealing party.  *Capistrano*, 59 F.3d at 891.  Moreover, Sacramento's

20   protests against the ALJ's weighing of the evidence is particularly ineffective where the Ninth

21   Circuit has determined that even greater deference is due to an ALJ's determination regarding the

22   credibility of witnesses.  *Seattle Sch. Dist.*, *No. 1*, 82 F.3d at 1499.

23                    B.  Defendants' Opening Brief

24                         i.  *ALJ Decision*

25        In addition to their opposition to Sacramento's motion for summary judgment, Defendants

26   submitted an opening brief.  (ECF No. 19.)  First, the brief recounts many arguments that

27   Defendants set forth in their opposition to Sacramento's motion for summary judgment.

28   However, they seek three specific determinations from the Court.

First, Defendants argue that the ALJ's decision is due substantial deference because it was thorough and careful. (ECF No. 19 at 11–12.) An administrative decision is "thorough and careful" where the ALJ "participates in the questioning of witnesses and writes a decision containing a complete factual background as well as a discrete analysis supporting the ultimate conclusion." *R.B. v. Napa Valley Unified Sch. Dist.*, 496 F.3d 932, 942 (9th Cir. 2007) (internal citations omitted). The Court has reviewed the evidence in this case, as well as the 39 page decision and reasoning by the ALJ and concludes, as previously stated in Section V.A.i., supra, that the ALJ in this case made a thorough and careful decision in this case. Therefore, the Court owes deference to the ALJ's decision. *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1524 (9th Cir. 1994)

Second, Defendants ask the Court to confirm that the ALJ's finding that Sacramento's September 23, 2013 IEP failed to offer adequate and appropriate mental health services to address Student's educational needs. (ECF No. 19 at 13–21.) A child has received a FAPE where the program offered "(1) addresses the child's unique needs, (2) provides adequate support services so the child can take advantage of the educational opportunities, and (3) is in accord with the individualized education program." *Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 893 (9th Cir. 1995). The facts in this case indicate that the September 23, 2013, IEP was not "reasonably calculated to provide educational benefit" to Student. *Rowley*, 458 U.S. at 206–207. Sacramento itself identified that Student's mental challenges impacted her ability to learn. AR 1114. The Court has reviewed the administrative record and the decision of the ALJ and finds that the ALJ was correct in concluding that the September 23, 2013, IEP failed to offer adequate and appropriate mental health services to Student. The Court concurs that Student's performance history, mental health history, and determinations made at Student's IEP reviews support the ALJ's conclusion that Student required therapy from one experienced therapist, rather than two separate therapists at two separate school campuses. *See* AR 1114.

Third, Defendants ask the Court to confirm that the ALJ's finding that Sacramento's dual placement plan was "not reasonably calculated" to provide education benefit to Student. (ECF No. 19 at 21– 22.) For the same reasons stated above, the Court concurs with the ALJ's finding

that Sacramento's FAPE was not reasonably calculated to allow Student to progress.  In reaching this conclusion, the ALJ correctly applied the applicable law in finding that Sacramento was responsible for addressing Student's mental health needs as required in order for Student to receive the benefit of a FAPE.  However, to the extent Defendants request that the Court make a finding against Sacramento outside the confines of the ALJ's determination, the Court declines to do so.

Finally, Defendants seek a finding from this Court that the remedy ordered by the ALJ was appropriate and in the scope of her discretion.  (ECF No. 22–24.)  The ALJ determined that:

> As a compensatory equitable remedy, Parents are therefore entitled to reimbursement for the costs of their travel and Student's nonpublic school tuition and residential treatment placement, and related services, from October 9, 2013, through the end of the regular 2013 – 2014 school year in June 2014. As an additional equitable remedy, Sacramento shall continue to reimburse Parents for those costs through the end of the 2014 summer extended school year.Sacramento maintains that it should not be obligated to pay

AR 1122.  Sacramento protests this award, arguing that Defendants' had "unclean hands" and did not participate in the special education process in good faith.  (Compl., ECF No. 1 at 10.)

Sacramento misses the mark on this dispute.  The ALJ made no determination that Student should have been placed in residential placement to meet the requirements of the IDEA.  Rather, the salient point of the ALJ's findings was that Student was denied a FAPE and that her parents provided an appropriate placement for Student when it became clear that her educational needs were not being met.  AR 1122.  School districts may be ordered to provide compensatory education or additional services to a pupil who has been denied a FAPE.  *Student W. v. Puyallup School District*, 31 F.3d 1489, 1496 (9th Cir. 1994).  Student received both educational and therapeutic services at Falcon Ridge.  AR 1122.  It is true that Sacramento would not have been required to provide a FAPE with such a high level of services, even though Defendants asked for it.  However, the inquiry in this instance is not whether Sacramento needed to provide residential placement but whether the solution Sacramento did offer was sufficient.  It was not.  Therefore, Sacramento is responsible for reimbursing Defendants for the costs they incurred providing educational services to their child within the meaning of the IDEA.

1      ii.  *Defendants' Counterclaims*

2              Defendants also use their opening brief to ask this Court to grant summary judgement as

3      to their second counterclaim, asserting that Sacramento's failure to provide residential placement

4      to Student violated Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq.*

5      ("Section 504").  (ECF No. 19 at 24–30.)  Defendants also seek summary judgment as to their

6      second counterclaim, asking the Court to award legal fees to Defendants as the prevailing party.

7      (ECF No. 19 at 30–31.)

8              First, Defendants bring a counterclaim against Sacramento, arguing that its actions

9      violated Section 504.  (Answer, ECF No. 11 at ¶¶ 72 – 81.)  An individual bringing a claim under

10     Section 504 must show: "(1) he is an individual with a disability; (2) he is otherwise qualified to

11     receive the benefit; (3) he was denied the benefits of the program solely by reason of his

12     disability; and (4) the program receives federal financial assistance." *Duvall v. Cty. of Kitsap*,

13     260 F.3d 1124, 1135 (9th Cir. 2001).  Sacramento "is liable for damages for violating § 504 if it

14     failed to provide [Student] a reasonable accommodation that [she] needed to enjoy meaningful

15     access to the benefits of a public education, *and did so with deliberate indifference*." *Mark H. v.*

16     *Hamamoto*, 620 F.3d 1090, 1097 (9th Cir. 2010) (emphasis added).  "Deliberate indifference

17     requires both knowledge that a harm to a federally protected right is substantially likely, and a

18     failure to act upon that likelihood." *Lovell v. Chandler*, 303 F.3d 1039, 1056 (9th Cir. 2002)

19     (internal citations omitted).

20             Based on the administrative records of this case, the Court finds that Defendants have

21     failed to prove that Sacramento exhibited deliberate indifference toward Student in creating a

22     FAPE that would accommodate her needs.  The ALJ limited her finding against Sacramento to

23     the September 27, 2013 IEP alone.  AR 1115.  The ALJ found, and the Court concurs, that

24     Sacramento provided appropriate academic instruction for the 10th and 11th grades.  AR 1109.

25     The ALJ also determined, and the Court concurs, that Sacramento met the statutory requirements

26     to provide Student a FAPE with its June 2013 IEP.  AR 1112.  As for the September 27, 2013

27     IEP, while it was inadequate to provide Student with a FAPE, the fact remains that Sacramento

28     did not deliberately refuse to provide Student with an IEP. *Duvall v. Cty. of Kitsap*, 260 F.3d at

1140 (finding that the school district's conduct must be more than negligent, but must involve an element of deliberateness). Defendants have not provided evidence of a deliberate indifference in Sacramento's actions with respect to the September 2013 IEP. On these grounds, the Court denies Defendants' motion for summary judgment as to its second counterclaim.

With respect to Defendants' third counterclaim, Defendants argue that they are entitled to attorneys' fees as the prevailing party in their Section 504 action. (ECF No. 19 at 30–31.) Because the Court did not find in favor of Defendants' motion for summary judgment on their Section 504 counterclaim, the Court similarly cannot award attorneys' fees.

**VI.    CONCLUSION**

For the foregoing reasons, the Court DENIES Sacramento's motion for summary judgment and finds that the ALJ's Decision is substantially supported by the administrative record and thus AFFIRMS the ALJ's Decision. The Court further DENIES Defendants' motion for summary judgment as to Defendants' second and third counterclaims.

Dated: October 6, 2016

Troy L. Nunley
United States District Judge